Shawali KHAN, Petitioner,

v.

Barack H. OBAMA, et al., Respondents.

Civil Action No. 08–1101 (JDB).

United States District Court, District of Columbia.

Sept. 3, 2010.

Leonard C. Goodman, H. Candace Gorman, Law Office of H. Candace Gorman, Chicago, IL, Gitanjali Gutierrez, New York, NY, Kent Spriggs, Spriggs Law Firm, Tallahassee, FL, for Petitioner.

Frederick Sherwood Young, Judry Laeb Subar, Kristofer Ryan McDonald, Mary Elizabeth Carney, Scott Douglas Levin, Scott Michael Marconda, Alexander Kenneth Haas, David P. Avila, David Hugh White, Julia A. Berman, Kathryn Celia Mason, Patrick D. Davis, Robert J. Prince, Terry Marcus Henry, U.S. Department of Justice, Washington, DC, for Respondents.

## MEMORANDUM OPINION

JOHN D. BATES, District Judge.

Shawali Khan, an Afghan citizen, has been in United States custody since mid-November 2002, and has been detained at the United States Naval Base at Guantanamo Bay, Cuba, since early 2003. Contending that he is unlawfully detained under the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107–40, 115 Stat. 224 (2001), Khan filed a petition for a writ of habeas corpus in this Court. The government has responded that Khan is lawfully detained because he was a member "of Hezb-i–Islami Gulbuddin ('HIG'), an organization that served as an associated force of the Taliban and al-Qaida in hostilities against the United States and its coalition partners." Resp'ts' Pre–Hearing Mem. ("Resp'ts' Mem."), 1.

During the early stages of this litigation, Khan "sought—and received—an 'expedited' [Case Management Order], which provided him with an opportunity to file a motion for judgment on the record before full discovery had been conducted." *Khan v. Obama*, 646 F.Supp.2d 6, 10 (D.D.C.

2009). The Court denied Khan's motion for judgment on the record, concluding that "although much of respondents' evidence is fatally lacking adequate indicia of reliability, the evidence that remains is sufficient . . . to warrant denial of petitioner's motion." *Id.* at 20. The parties thereafter completed discovery.

On May 13, 14, and 17, 2010, the Court held an evidentiary hearing, at which it heard arguments from counsel, considered the written evidence in the case, and heard testimony from Khan and from Professor Brian Williams, Khan's expert on Afghan warlords. Upon review of all the evidence presented and considered at the evidentiary hearing, the parties' several memoranda, the applicable law, and the entire record herein, and for the reasons set forth below, the Court will deny Khan's petition for a writ of habeas corpus. As framed over the course of these proceedings, this case now centers on a few key pieces of evidence, which the Court finds reliable and which clearly establish Khan was a "part of" HIG when he was captured in 2002. Hence, he is lawfully detained.

## LEGAL STANDARDS

### I. Burden of Proof

█ Pursuant to the Case Management Order in this action, "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." Feb. 20, 2010 Case Management Order [Docket Entry 81], at 3; *accord Al–Adahi v. Obama*, 613 F.3d 1102, 1104–05 (D.C.Cir.2010); *Awad v. Obama*, 608 F.3d 1, 10–11 (D.C.Cir. 2010). That standard " 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence.' " *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508

U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) (citation omitted)).

## II. The Government's Detention Authority

The AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." AUMF, § 2(a). Such "necessary and appropriate force" includes the power to detain combatants subject to such force. *See Hamdi v. Rumsfeld,* 542 U.S. 507, 519, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion); *Al–Bihani v. Obama,* 590 F.3d 866, 872 (D.C.Cir.2010) [hereinafter *Al–Bihani II* ]. The scope of this power is broad: the government may detain any individual "engaged in hostilities ... against the United States," who "purposefully and materially supported hostilities against the United States or its coalition partners," or who "is part of the Taliban, al-Qaida, or associated forces." *Al–Bihani II.* 590 F.3d at 871–72; *see also Hamlily v. Obama,* 616 F.Supp.2d 63, 75 (D.D.C.2009).

"[T]here are no settled criteria," for determining who is "part of" the Taliban, al-Qaida, or an associated force. *Hamlily,* 616 F.Supp.2d at 75; *accord Bensayah v. Obama,* 610 F.3d 718, 725 (D.C.Cir.2010). "That determination must be made on a case-by-case basis by using a functional rather than formal approach and by focusing on the actions of the individual in relation to the organization." *Bensayah,* 610 F.3d at 725; *accord Hamlily,* 616 F.Supp.2d at 75. The Court must consider the totality of the evidence to assess the individual's relationship with the organization. *See Naji al Warafi v. Obama,* 704 F.Supp.2d 32, 37–39 (D.D.C.2010). But

being "part of the Taliban, al-Qaida, or an associated force requires "some level of knowledge or intent." *Hamlily,* 616 F.Supp.2d at 75; *see also Bensayah,* 610 F.3d at 725 ("purely independent conduct of a freelancer is not enough" to demonstrate an individual was "part of an organization.).

## III. Preliminary Evidentiary Issues

The evidence on which the government relies to justify Khan's detention is "atypical of evidence usually presented in federal actions." *Abdah v. Obama,* 709 F.Supp.2d 25, 27 (D.D.C.2010). Indeed, the government presents a variety of documents "produced and used by government intelligence agencies." *Id.* This evidence includes Information Reports ("IIRs"), [redacted] and Form 40s ("FM40s"). IIRs are Department of Defense documents reporting information obtained from human intelligence sources by the Defense Intelligence Agency and the military's intelligence services. *See* Evidentiary Hr'g, Resp'ts' Ex. 11 (Decl. of [redacted] Intelligence 101 ("Intelligence 101"), at 6. [redacted] Finally, FM40s are law documents that record "investigation activity, such as witness interviews," and "record information relevant to how a crime was committed as well as the logical and factual basis for any deductions about guilt." Intelligence 101 at 7.

Although many of these documents contain hearsay, hearsay is always admissible in Guantanamo habeas cases. *See Al–Bihani II,* 590 F.3d at 879. The Court must determine, however, "what probative weight to ascribe to whatever indicia of reliability [the hearsay evidence] exhibits." *Id.* Hence, " '[t]he fact finder must evaluate the raw evidence," resolving whether it is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.' " *Parhat v.*

*Gates,* 532 F.3d 834, 847 (D.C.Cir.2008) (quoting *Concrete Pipe & Prods., Inc.,* 508 U.S. at 622, 113 S.Ct. 2264). The parties therefore must present hearsay evidence "in a form, or with sufficient additional information, that permits the . . . court to assess its reliability." *Id.* at 849.

▮▮▮▮ Under *Parhat,* then, the Court first considers whether a particular piece of evidence itself possesses "sufficient hallmarks of reliability," and whether it is corroborated by other reliable evidence. *See Khan,* 646 F.Supp.2d at 12; *see also Parhat,* 532 F.3d at 849 ("There may well be other forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source."); *Rugendorf v. United States,* 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964) (affidavit in support of a search warrant containing hearsay from a confidential source may be reliable "so long as there was a substantial basis for crediting the hearsay"); *United States v. Laws,* 808 F.2d 92, 100–03 (D.C.Cir.1986) (one informant's hearsay statement can corroborate another informant's hearsay statement). The Court then determines "whether the evidence is in fact sufficiently reliable to be used as a justification for detention." *Khan,* 646 F.Supp.2d at 12. "[I]f courts cannot assess reliability, then the evidence in question is inherently unreliable and may not be relied upon to justify detention." *Id.*

▮▮▮▮ The government also supports its case for Khan's detention with declarations from government officials and intelligence collectors. A court generally may consider sworn affidavits in a habeas proceeding. *See* 28 U.S.C. § 2246 ("On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in

the discretion of the judge, by affidavit."); *accord Bostan v. Obama,* 662 F.Supp.2d 1, 4 (D.D.C.2009) (government may use affidavits or declarations rather than live witness testimony).[1] And in Guantánamo habeas cases, the government may establish a source's reliability through a sworn declaration "from a relevant member of the intelligence community attesting to personal knowledge of the accuracy of a source's statements." *Al–Bihani v. Obama,* 662 F.Supp.2d 9, 20 n. 12 (D.D.C.2009) [hereinafter *Al–Bihani I*].

## ANALYSIS

The government asserts that it can detain Khan under the AUMF because he was a member of an HIG cell operating in Kandahar, Afghanistan, in 2002. The government's narrative proceeds in three parts: (1) HIG is "a terrorist organization that functions as an associated force of al-Qaida and the Taliban in hostilities against the U.S. and its coalition partners," Resp'ts' Mem. at 9; (2) Khan had a long-standing association with HIG, serving as a radio operator during the anti-Soviet jihad, *see id.* at 11–12; and (3) Khan rejoined HIG after September 11, 2001, operating as a communicator for an HIG cell in Kandahar that plotted attacks on U.S. and coalition forces, *see id.* at 13–14.

Khan largely concedes the first two parts of the government's narrative, but he denies that he was a member of HIG after September 11, 2001. *See* Pet'r's Mem. at 1 ("Khan's activities between the arrival of United States forces in late 2001 and Khan's capture on or about November 13, 2002, are in dispute and are the focus of this case."). Instead, he "insists that he was managing a small petrol shop in Kandahar," before his capture *id.,* and argues that the evidence demonstrating that he

---

1. For this reason, Khan's challenge to the government's declarations on the theory that the declarants are "unavailable to testify and submit to cross-examination," Pet'r's Pre-Hearing Mem. ("Pet'r's Mem."), 3, lacks merit.

was a member of a Kandahar HIG cell at that time is unreliable, *see id.* at 2–5.

Following the parties' lead, the Court will focus its analysis on Khan's relationship with HIG after September 11, 2001. It will explore each parties' explanation for Khan's activities during that period, and will consider the reliability of the evidence in support of those explanations. The Court will also briefly review the evidence in support of the first two parts of the government's narrative. First, however, Khan's concern that the government failed to abide by its discovery obligation will be addressed.

## I. Challenges to the Discovery Process

▮ Throughout this litigation, Khan has asserted that the government has "ignored its obligation to search for exculpatory evidence." PetVs Mot. to Strike Supp. Factual Return ("PetVs Mot. to Strike"), 3; *see also* May 13, 2010 Hr'g Tr. 156:4–157:25. And he has suggested that, as a remedy, the Court should strike the government's supplement to its factual return. See PetVs Mot. to Strike at 1. Specifically, he alleges that the government has not complied with the Court's October 21, 2009 discovery order, which defined exculpatory evidence and detailed the locations in which the government must search for that evidence. *See* Oct. 21, 2009 Order [Docket Entry 147], at 1 ("When respondents examine a particular database, file, or similar location ... respondents shall also perform a simultaneous search for ... exculpatory information."); *id.* at 1–2 (government must search for, among other things, "[e]vidence relating to cash bounties," "[e]vidence that unidentified informant[s] engaged in criminal activity," and "[a]ny other materials which are inconsistent with the allegations against petitioner as they are set out in the factual return").

Khan asserts his objection based on the fact that the government has not "dis-closed any of the exculpatory evidence described in the Court Order." Pet'r's Mot. to Strike at 3. In other words, he believes that the absence of exculpatory information evidences the government's failure to search for that information. *See* May 13, 2010 Hr'g Tr. 157:21–22 ("It strains credulity to suggest that there's no additional information."). The government, for its part, has consistently maintained that it has satisfied its discovery obligations.

The Court discussed Khan's concerns at the evidentiary hearing. After hearing the parties' arguments regarding discovery, the Court required the parties to confer about what searches the government conducted and, based on that representation, what discovery Khan believed remained outstanding. *See id.* at 174:14–175:5. It permitted Khan to seek additional discovery after that meeting, if necessary. *See id.* at 175:1–3 ("And that way Mr. Goodman can be more precise tomorrow morning in telling me where he thinks the government has come up short, if he does think the government has come up short...."). After the parties met, the government again represented to the Court that it had complied with its discovery obligations, and had searched all the required databases. *See* May 14, 2010 Hr'g Tr. 7:15–13:12. Based on the government's representations, Khan did not ask for further discovery. *See id.* at 14:2 ("I am not making any request to the Court.").

Although the Court believes the government could have been more transparent in describing its searches for exculpatory information, the Court has no basis on which to conclude that the government did not follow the Court's discovery orders. The fact that the government could not find the exculpatory information Khan sought does not establish that the government failed to conduct the required searches. Hence, the

Court will deny Khan's motion to strike the government's supplement to the factual return.[2]

## II. Uncontested Issues

### A. *HIG as an Associated Force of al-Qaida and the Taliban*

The Court does not assess whether HIG is an "associated force" of al-Qaida or the Taliban on a blank slate. The Court previously concluded in this case that "[r]espondents have provided enough evidence to show that HIG qualifies as an associated force engaged in hostilities against the United States or its coalition partners." *Khan*, 646 F.Supp.2d at 19 (internal quotation marks omitted); *see also* Evidentiary Hr'g, Resp'ts' Ex. 13 (Decl. of [redacted], 1 [redacted] *id.* at 2 [redacted]

Khan has offered no reason for the Court to deviate from its prior conclusion. And Khan's expert, Professor Brian Williams,[3] concurred with that assessment. Although Williams testified that prior to September 11, 2001, the relationship between HIG and al-Qaida and the Taliban was acrimonious, he observes that after September 11, 2001, HIG reconciled with those organizations. *See* May 13, 2010 Hr'g Tr. 106:15–108:256: *see also id.* 108:15–17 ("[P]ost 9/11. when you have this burying of the hatchet between the Taliban . . . and HIG, you also have the sort of burying of the hatchet with Bin Laden and al-Qaida."). Accordingly, the Court concludes that HIG was an "associated force" of al-Qaida and the Taliban at the time of Khan's capture in late 2002.[4]

### B. *Khan's Relationship with HIG Prior to September 11, 2001*

The Court also previously concluded that Khan "was active in HIG during jihad against the former Soviet Union." *Khan*, 646 F.Supp.2d at 17 (Khan's HIG activities during the Soviet invasion are "amply corroborated by . . . reliable evidence"); *see also* Evidentiary Hr'g, Resp'ts' Ex. 35 (ISN 899 FM40 (Feb. 21, 2003) ("Feb. 21, 2003 FM40")), 1 ("Khan worked for the Hezb Islami Gulbuddin (HIG) during the Mujahadeen. . . ."); Evidentiary Hr'g, Resp'ts' Ex. 56 (ISN 899 Interrogator Notes (Jan. 9, 2003) ("Jan. 9, 2003 Interrogator Notes")), 1 (Khan spent seven years in Russian jihad); May 13, 2010 Hr'g Tr. 10:1–2 (Khan's Counsel: "We're not disputing what he said, that he was associated with HIG.").[5]

---

**2.** Also before the Court is the government's second motion to amend the factual return. The Court will grant that motion.

**3.** Khan tendered Williams, a professor of Islamic history at the University of Massachusetts, Dartmouth, as an expert "on Afghan warlords and the Taliban from 1990 to the present." May 13, 2010 Hr'g Tr. 98:17–19. The government objected to the breadth of Williams's tendered expertise. *Id.* 98:24–99:17. Although the Court noted the objection, it "conditionally admitted" Williams as an expert, and permitted the government to renew its objection at the close of Williams's testimony. *Id.* 98:18–23. The government did not do so.

**4.** To be sure, Williams testified that the collaboration between HIG and the Taliban gained "traction" in 2003 and 2004, after Khan is alleged to have been affiliated with HIG. *See* May 13, 2010 Hr'g Tr. 107:21–23. But this is not inconsistent with [redacted] And, in fact, Williams offered that it was the coalition invasion of Afghanistan in 2001 that "established [HIG's] loose sort of collective mission with the Taliban." *Id.* at 108:20.

**5.** To be sure, Khan testified at the evidentiary hearing that he had never served in the conflict against the Soviets. *See* May 17, 2010 Hr'g Tr. 28:15–16. Although Khan has occasionally denied this charge, "he has more often than not admitted it." *Khan*, 646 F.Supp.2d at 17. In view of the above evidence, and Khan's counsel's concession that Khan was a member of HIG during the anti-Soviet jihad, the Court does not find Khan's denials of this fact credible.

During the anti-Soviet jihad, Khan served as an "ICOM" radio operator for HIG, "communicat[ing] locally with other freedom fighters." Feb. 21, 2003 FM40 at 1; *see also* Evidentiary Hr'g, Resp'ts' Ex. 33 (ISN 899 FM40 (Feb. 7, 2003) ("Feb. 7, 2003 FM40")), 1 ("Shawali [Khan] claimed he fought against the Russians for approximately 3–5 years ... during the Russian occupation of Afghanistan. He performed duty as a radio operator."). He acted under the command of his uncle, Zabit Jalil. *See* Jan. 9, 2003 Interrogator Notes at 2 ("Q: Who did you get your orders from ? A: Most of the Orders came from Pakistan over the radio and then [were] relayed through their immediate commander. His immediate commander was his uncle Zabit Jalil."). Khan generally "worked at home," but "would occasionally participate in the fighting against the Russians only when needed." Feb. 7, 2003 FM40 at 1. As the Court previously concluded, the record establishes that Khan was a member of HIG during the antiSoviet jihad.[6]

### III. Contested Issue: Khan's Association with HIG after September 11, 2001 [7]

#### A. *The Government's Narrative*

The government contends that Khan's "active participation in the HIG terrorist organization was discovered by intelligence personnel investigating a HIG terrorist cell in Kandahar." Rep'ts' Mem. at 13. According to the government, in October and November 2002, a source came to U.S. intelligence collectors and revealed that an HIG cell was operating in Kandahar. *See* Evidentiary Hr'g, Resp'ts' Ex. 18 (IIR 6 044 0249 03), at 1–4; Evidentiary Hr'g, Resp'ts' Ex. 19 (IIR 6 044 0266 03), at 1–4. This source identified two members of the cell-Shawali Khan and Noor Agha—and indicated that Khan served as a communicator between Noor Agha, the cell's facilitator, and the other cell members. *See* IIR 6 044 0266 03 at 2 ("[Khan] contacts other cell members solely through radio communications and acts as a messenger between cell operatives and Noor ((Agha))."). The source told U.S. intelligence collectors that the HIG cell was "planning an attack against Americans through the use of radio-controlled binary explosive devices." IIR 6 044 0249 03 at 1. He explained how the process worked:

> Once the target is identified, [an operative] uses a radio to communicate to the second operative who has concealed himself near the kill zone. The second operative arms the detonation device [redacted] Americans are close enough to the kill zone, the first explosion is detonated by keying the radio [redacted] .... A second, more powerful explosion

---

**6.** The government asserts that Khan fought with the Taliban against the Northern Alliance in the late 1990s. *See* Resp'ts' Mem. at 12. According to Khan, however, he was "forced to join the Taliban army when they were in power." Evidentiary Hr'g, Resp'ts' Ex. 50 (ISN 899 SIR (Mar. 29, 2007)), 3. The Court need not resolve the parties' disagreement, because the government does base Khan's detention on the fact that he was part of the Taliban.

In part to challenge the government's allegation that he fought with the Taliban, Khan has moved for leave to submit nine sworn declarations from family members, neighbors, and nearby shopkeepers in support of his habeas corpus petition. *See* Pet'r's Mot. for Leave to File ("Pet'r's Mot. for Leave") [Docket Entry 220], at 1, 2. These declarations state that Khan was not a part of the Taliban, and never fought against the United States. The Court will grant him leave to file the declarations.

**7.** The Court will not discuss evidence that it has determined is irrelevant or unnecessary to the resolution of Khan's case.

is detonated by keying the radio [redacted]

*Id.* at 3. [redacted] *See id.* at 4.

The government submitted declarations that provide information about this source. The declarants, intelligence collectors for the United States Army Special Operation Command, state that the source was [redacted].[8]  *See* Evidentiary Hr'g. Resp'ts' Ex. 1 (Decl. of Intelligence Collector [redacted] Decl.")), ¶¶ 1, 37;  Evidentiary Hr'g, Resp'ts' Ex. 2 (Decl. of Intelligence Collector [redacted] Decl.")), ¶¶ 1, 14.[9] The collectors aver that [redacted] was a reliable source.  *See* [redacted] Decl. at ¶ 38; [redacted] Decl. at ¶ 15.  For example [redacted] states that

> [a]s I continued to meet with [redacted] became more and more confident that he was providing extremely reliable information.  He spoke to me voluntarily and in a spontaneous and detailed way, and, to the extent we were able to make a determination, the intelligence he provided was accurate.  Moreover, in my assessment, [redacted] was not engaged in disinformation or being manipulated. . . . [redacted] appeared to me to be a person who spoke the truth as he understood it.  He provided detailed and spontaneous responses that are not typical of a person who is trying to mislead.

[redacted] Decl. at ¶ 38.  Moreover, according to [redacted], the fact that [redacted] confirmed his reliability: "[i]t was extremely unusual for a source to provide such evidence to back up his statements. This type of action is a sign of above-average reliability."  *Id.* at ¶ 43. [redacted] agrees with [redacted] assessment of [redacted] "[a]t first, because [redacted] was an admitted member of a terrorist cell actively targeting U.S. personnel, I was

very suspicious of his motives and the veracity of the information he would provide.  But as time went on, his information proved to be very reliable." [redacted] Decl. at ¶ 15. [redacted] adds that his "Team was able to independently verify much of the information [redacted] provided." *Id.*

The intelligence collectors obtained similar information about the presence of an HIG cell in Kandahar, and Khan's role in that cell, from two other sources.  First, a source, identified by the intelligence collectors as [redacted] in Kandahar, *see* [redacted] Decl. at ¶ 22, related that "Shah ((Wali)) is a go-between and a facilitator within a Hezb–i–Islami, Gulbuddin (HIG) operations cell," who "delivered a radio-controlled binary detonation device and two blasting caps to an operative working within his organization," Evidentiary Hr'g, Resp'ts' Ex. 17 (IIR 6 044 0025 03), at 3.  According to the intelligence collectors; [redacted] "did not personally witness the events he described . . .;  he heard about them from a sub-source."  *Id.* at ¶ 23.  The collectors suggest that [redacted] is [redacted] sub-source for the information found in IIR 6 044 0025 03, and state that [redacted] originally introduced [redacted] to them.  *See* [redacted] Decl. at ¶ 24; [redacted] Decl. at ¶ 21.

Second, a different Afghan government official obtained information confirming that an HIG cell existed in Kandahar, and was planning an attack on U.S. and coalition forces.  *See* Evidentiary Hr'g, Resp'ts' Ex. 21 (IIR 6 044 0300 03), at 6–7 ("The information and methods of operation in this report confirms, in part, the information reported in IIR 6044 0249 03 . . . .").  The intelligence collectors "do not specifically recall this source," but remember

---

8. There is no evidence in the record indicating whether [redacted] Agha. is related to Noor

9. [Redacted] For this reason, there is no merit to Khan's assertion that by using the code, the intelligence collectors have not sworn to their declarations.  *See* Pet'r's Mem. at 3.

that the source only had indirect access to the information he reported. *See* [redacted] Decl. at ¶ 30. The collectors aver, however, that they are "confident the sub-source for the information contained in IIR 6 044 0300 03 is not the same person" as any of the collectors' other sources. *Id.* at ¶ 29. This is so because "[i]f there was any reason to believe the original source, or sub-source, was someone with whom [their] team had worked, that would have been noted in the IIR." *Id.*

Based on the information obtained from [redacted] and the Afghan government official, the military captured Khan and searched his properties The searches yielded [redacted]

Further, the government asserts that, approximately a month after the searches, Khan himself admitted [redacted] During an interrogation of Khan on December 17, 2002, Khan was asked [redacted] Evidentiary Hr'g, Resp'ts' Ex. 53 (ISN 899 Interrogator Notes (Dec. 17, 2002) ("Dec. 17, 2002 Interrogator Notes")), at 2. According to the summary of that report, Khan responded [redacted] The government argues that the fact Khan admits [redacted] corroborates his HIG activity. *See* Resp'ts' Mem. at 29 ("The more convincing explanation is the one offered by Respondents—[redacted] [10]

### B. *Khan's Narrative*

Khan largely responds to the government's case for detention by challenging the reliability of the evidence on which that case is predicated. He does, however, briefly offer his own narrative explaining his activities after September 11, 2001. According to Khan, "he was managing a small petrol shop in Kandahar and had no involvement in any terror cell or in any activities in opposition to the United States or its allies." Pet'r's Mem. at 1; *accord* May 17, 2010 Hr'g Tr. 9:11–20 (Khan testified that he was working at a petrol shop at the time of his capture); *see also* Pet'r's Mot. for Leave, Ex. 1 (Decl. of Nazar Ali), ¶ 1 ("My brother ShaWali and I were never with the Taliban. Anybody can tell you this. We were only shopkeepers."); Pet'r's Mot. for Leave, Ex. 2 (Decl. of Mohammah Zay), ¶ 3 ("ShaWali was only a shopkeeper, he never fought anybody.").

Moreover, through his expert, Khan argues that there likely was no HIG cell in Kandahar at the time of his capture. Professor Williams testified that it is "strange, improbable, [and] unlikely" that HIG would be operating in Kandahar. May 13, 2010 Hr'g Tr. 118:11–12. He explained that "[i]n my own traveling, I have seen many warnings about travel through the territories east of Kabul, warning about HIG attacks …, but I've never seen warnings for HIG attacks or insurgent activity down in Kandahar, which is what the military calls Taliban Central." *Id.* at 117:12–116. And Professor Williams indicated that Hekmatyar, HIG's leader, is a member of a tribal confederation that has little or no presence in the area around Kandahar. *See id.* at 101:24–102:22. Hence, he concludes that "Hekmatyar isn't a major insurgent threat in Kandahar." *Id.* at 117:24. [11]

10. [Redacted]

11. Khan also offers a chapter from the memoirs of journalist Sarah Chayes to demonstrate that HIG did not have a cell in Kandahar in 2002. In that chapter, Chayes, who lived in Kandahar, writes that the CIA reported an alleged HIG threat against her life. *See* Evidentiary Hr'g, Pet'r's Ex. A ("The Punishment of Virtue" by Sarah Chayes), 217. She reports that she and her Afghan friends dismissed this threat, concluding that "[t]he faction leader Gulbuddin Hekmatyar had no presence in Kandahar Province as far as [they] knew." *Id.; see also* May 17, 2010 Hr'g Tr. 42:20:23 (Khan's Counsel: "So I think the fact that she was satisfied that it was not a true threat and she [chose] to live among the people of Kandahar and was not

Further, Khan offers that another individual alleged to have been the leader of the Kandahar HIG cell, Mullah Hamitullah Sangaryar, a former inmate at Guantanamo Bay, was transferred to Afghanistan and subsequently released. *See* Pet'r's Mem. at 15. According to an intelligence report, after Khan's capture, Zabit Jalil installed Sangaryar as the "new head of [the] Hezb–E Islami, Gulbuddin cell in Kandahar, Afghanistan." Evidentiary Hr'g, Resp'ts' Ex. 26 (IIR 6 044 0879 03), at 2. Nevertheless, Khan believes that after the United States transferred Sangaryar to Afghanistan, he was released— "[h]e's out walking around someplace now." May 13, 2010 Hr'g Tr. 167:16. Khan therefore intimates that there must not have been an HIG cell in Kandahar, for "otherwise Sangaryar would not have been released." Pet'r's Mem. at 16.[12]

## IV. Reliability of the Evidence

■ The Court concludes that if reliable evidence supports the government's narrative—that Khan was a communicator for an HIG cell in Kandahar in 2002—the government may properly detain Khan under the AUMF. It therefore turns to assessing the reliability of the evidence deployed by the government. Khan contends that the raw intelligence reports detailing his role as a communicator for HIG and describing the items seized in the search of his properties are inherently unreliable. And, in his view, the government cannot mitigate the reports' unreliability through declarations authored by the intelligence collectors who wrote the reports. He therefore concludes that there is no reliable evidence in the record

supporting his detention. The Court is not persuaded by Khan's challenges.

### A. *Reliability of the Reporting Detailing Information Obtained from Sources*

In support of Khan's detention, the Court relies on several intelligence reports—IIR 6 044 0249 03, IIR 6 044 0266 03, IIR 6 044 0025 03, IIR 6 044 0300 03— reflecting information obtained from confidential sources. The Court previously found these intelligence reports, standing alone, inherently unreliable. *See Khan,* 646 F.Supp.2d at 14–16. It reached this conclusion by assessing the reports under the standards used by intelligence collectors themselves. *Id.* at 13, 16–17. [redacted] Intelligence 101 at 8. [redacted] *Id.* at 8–9. [redacted] *Id.* at 9.

The Court found that the intelligence reports offered by the government did not themselves contain the information necessary to assess them under the standards used by intelligence collectors. *See Khan,* 646 F.Supp.2d at 14–16. It sees no reason to deviate from that conclusion. Nor has the government offered one.

The government, however, has now submitted sworn declarations from the members of the intelligence team that produced the reports at issue to furnish the information necessary to assess the reports' reliability. *See Al–Bihani I,* 662 F.Supp.2d at 20 n. 12 (government may establish a source's reliability through a sworn declaration "from a relevant member of the intelligence community attesting to personal knowledge of the accuracy of a source's statement's"); *see also Parhat,* 532 F.3d at 849 ("There may well be other

---

[scared], I think you could take it for what it was. But that is somewhat significant, I believe."). As the Court noted at the evidentiary hearing, however, it "can't be in the business of saying that a journalist's assessment of whether intelligence is true or false"—not

made under oath—"is something I should rely on." May 17, 2010 Hr'g Tr. 42:13–15.

12. There is no evidence in the record indicating whether Sangaryar was released after being transferred to Afghanistan.

forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source."). These declarations provide the information necessary to assess the sources' reliability under the principles accepted in the intelligence community.

*IIRs 6 044 0249 03 and 6 044 0266 03:* Both IIR 6 044 0249 03 and IIR 6 044 0266 03 contain information obtained from [redacted] *See* [redacted] Decl. at ¶ 35. The collectors explain that [redacted]. *See id.* at ¶¶ 38, 41. And they state that [redacted] shared information with them "to make amends for [an] attack [by HIG] that resulted in the death of some of his tribesmen." [redacted] Decl. at ¶ 15d. In other words, [redacted] *Id.* at ¶ 15.

Nevertheless, the intelligence collectors initially were "wary because [they] would not easily trust a man [redacted] Decl. at ¶ 38. But as they continued to meet with [redacted] the collectors "became more and more confident that [redacted] was providing extremely reliable information. He spoke to [the collectors] voluntarily and in a spontaneous and detailed way, and to the extent [the collectors] were able to make a determination, the intelligence [redacted] provided was accurate." *Id.; see also id.* at ¶ 41 ("Our Team was able to independently verify much of the information he provided."); *id.* at ¶ 42 ("To demonstrate that he was familiar with the activities of the HIG cell conducting attacks on American forces in Kandahar, [redacted] provided a detailed description of an earlier attack on a Military Police patrol. His account was corroborated by the detailed account that had been provided to us by members of the targeted patrol.").

The declarations provide sufficient information for the Court to assess [redacted] reliability. And based on that information, the Court concludes that the IIRs detailing

[redacted] reports are reliable. [redacted], came to the intelligence collectors voluntarily, and provided information wittingly. *See* [redacted] Decl. at ¶ 15. And the intelligence collectors were able to verify independently much of the information he provided. *See* [redacted] Decl. at ¶¶ 41–42. Moreover, the intelligence collectors aver that, based on their training, they concluded that [redacted] behavior and the type of information he provided—[redacted]—was consistent with a reliable source. *See id.* at ¶¶ 38, 43. Based on these facts, the Court has "reason to believe the information provided by the [source] is generally accurate." *Al–Bihani I*, 662 F.Supp.2d at 20 n. 12.

Further, that the intelligence collectors themselves assessed [redacted] to be reliable confirms the Court's conclusion. *See* [redacted] Decl. at ¶ 38 ("Because the information [redacted] provided was assessed to be reliable and important, my Team Leader also took an interest in [redacted] and attended several of my meetings with him."); *id.* at ¶ 43 ("It was extremely unusual for a source to provide [physical] evidence to back up his statements. This type of action is a sign of above-average reliability."). Indeed, they concluded that [redacted] information was sufficiently reliable to plan the operation for Khan's capture based on it. *See* [redacted] Decl. at ¶ 45 ("We had credible information from [redacted] . . . that Shawali Khan would be at his oil shop at a certain time and, thus, we planned the operation accordingly."). Intelligence collectors in the field, facing dangerous life-or-death situations, would not, the Court concludes, act on the basis of information they felt was unreliable. [redacted] averred that the fact that the information [redacted] provided leading to Khan's capture "turned out to be reliable is consistent with the fact that [redacted] reported reliably to [the intelligence collectors]." *Id.* at n. 7.

*IIRs 6 044 0025 03 and 6 044 0300 03:* Because the Court concludes that the information [redacted] provided is reliable, it also concludes that the information provided in IIRs 6 044 0025 03 and 6 044 0300 03 is reliable, This is so because, as discussed above, both IIRs are consistent with the information reported by [redacted] *Compare* IIR 6 044 0025 03 at 3 [redacted] reported that Khan "delivered a radio-controlled binary detonation device and two blasting caps to an operative working within his organization"), *with* IIR 6 044 0249 03 at 2 [redacted] reports that HIG is "planning an attack against Americans through the use of radio-controlled binary explosive devices"); *see also* IIR 6 044 0300 03 at 6 (information in report "confirms, in part, the information reported in IIR 6 044 0249 03"). In other words, [redacted] reliable information corroborates the reliability of the same information provided by [redacted] and the unnamed Afghan government official. *See Rugendorf,* 376 U.S. at 533, 84 S.Ct. 825; *Laws,* 808 F.2d at 100–03.[13]

To be sure, Khan speculates that the Court should distrust the various sources' information because they "are notorious liars, drug abusers, criminals, and/or bounty hunters." Pet'r's Mem. at 5. But in their declarations, the intelligence collectors specifically refute this allegation. *See* [redacted] Decl. at ¶ 21 ("I am not aware of [redacted] ever being engaged in criminal activity, drug abuse, or having given false or unreliable information in this or any other case."); *id.* at ¶ 37 ("I am not aware of any information that [redacted] abused drugs or gave false or unreliable information in this or any other case."); *id.* at ¶ 47 ("I do not recall providing any compensation to [redacted]"); *id.* at ¶ 50 ("I am not aware of [the unnamed Afghan government official] ever being engaged in criminal activity, drug abuse, or having given false or unreliable information in this or any other case."). Moreover, the government's searches—which the Court has already concluded satisfy the government's discovery obligations—did not yield evidence supporting Khan's theory about the intelligence collectors' sources.[14]

Khan also contends that the intelligence collectors' declarations themselves are unreliable, and therefore the Court should not accept them to bolster the intelligence reports. He raises three challenges. First, he contends that the "declarants' claims are not credible in that they now, seven years later, suddenly remember critical information about their informants which they inexplicably failed to include in any of their contemporaneous intelligence reports." Pet'r's Mem. at 2. Second, he argues that the "declarants reveal their bias by vouching for the credibility of their informants even when they have no independent recollection of that information." *Id.* at 3. Third, he asserts that the declarations contain incorrect information, and therefore should not be believed. *See* May 13, 2010 Hr'g Tr. 88:6–91:25.[15]

---

13. This may be due, in part, to the fact that [redacted] was reporting information to U.S. intelligence collectors that he obtained from [redacted] *See* [redacted] Decl. at ¶ 21.

14. Khan also argues that the intelligence collectors' sources provided false information, thereby enmeshing the collectors in a conspiracy to entrap Khan. *See* May 14, 2010 Hr'g Tr. 44:2–9; *see also* May 17, 2010 Hr'g Tr. 45:17–21 (The Court: "But you have a theory here. Your theory is that Shawali Khan was set up and all of these reports are wrong, they're inaccurate in terms of HIG's role generally speaking during the 2002 time frame in Kandahar and in terms of Shawali Khan's role in this alleged HIG cell in Kandahar."). But Khan has offered no support for this theory, and the Court has already determined that the information [redacted] provided to the intelligence collectors is reliable.

15. Khan also argues that the declarations are unreliable because the declarants are unavail-

■ It is of no moment that the intelligence reports contain information regarding a source's reliability that do not appear in the original intelligence reports. As the intelligence collectors explain, there was no formal mechanism by which they could indicate a source's reliability in an intelligence report. *See* [redacted] Decl. at ¶ 12h ("Because this formal mechanism did not exist, source handlers were not permitted to . . . indicate [their] assessment of the source's reliability.") Nevertheless, the intelligence collectors were "constantly validating assets and judging their reliability." *Id.* Indeed, the intelligence collectors independently verified the accuracy of [redacted] information. *See* [redacted] Decl. at ¶ 15. And they found [redacted] information sufficiently reliable to use it to plan Khan's capture. *See* [redacted] Decl. at ¶ 59; *see also id.* at ¶ 12e ("Tactical operations may be initiated on the basis of information deemed reliable by the forces on the ground."). Therefore, the fact that the intelligence collectors did not include an assessment of a source's reliability in their intelligence reports does not render their current recollections unreliable.[16]

■ Nor is Khan correct that the intelligence collectors somehow are biased because they have vouched for the credibility of informants as to whom they have no independent recollection, such as the un-

named Afghan government official responsible for the information in IIR 6 044 0300 03.[17] As an initial matter, the collectors aver that they remember [redacted]—whose reliable reports are consistent with the information supplied by the unnamed Afghan government official. And the collectors explain how they can assess the unnamed Afghan government official's reliability: "(1) the source provided extremely detailed information, (2) the information he provided described the same operational footprint as [redacted] account and was, therefore, corroborated [redacted] information, and (3) the time at which this source provided this information was in close proximity to the time [redacted] provided consistent information." *Id.* at ¶ 53; *accord* [redacted] Decl. at ¶ 30. In other words, the intelligence collectors' assessment is the result of a systematic analysis of the information provided by the unknown source. Hence, the Court has no basis on which to conclude that the intelligence collectors' assessment is a product of bias.[18]

■ Finally, at the evidentiary hearing, Khan argued that the intelligence collectors' declarations contain incorrect information and therefore are not credible. *See* May 13, 2010 Hr'g Tr. 88:6–91:25. Specifically, he asserted that the intelligence collectors incorrectly remembered

---

able to testify. *See* Pet'r's Mem. at 3. But as the Court previously noted, it may permit testimony by affidavit or declaration in a Guantánamo habeas action.

16. Each intelligence report contains the warning that the information within is not "finished intelligence" and that the "source reliability has yet to be determined." Contrary to Khan's arguments, *see* Pet'r's Mem. at 14–15, these phrases do not demonstrate that the information in an intelligence report is unreliable. " 'Finished intelligence' refers to analytical products based on all sources available to the analyst. This warning is not an indication that the information is not reli-

able." [redacted] Decl. at ¶ 12e. And the intelligence collectors had no ability to change the "source reliability" language in a report "to indicate [their] assessment of the source's reliability." *Id.* at ¶ 12h.

17. Although there are several other sources who the intelligence collectors admit to not remembering, the information those other sources provided does not figure into the Court's analysis.

18. Indeed, the fact that the intelligence collectors candidly admit they do not independently remember the unnamed Afghan government official tends to bolster their credibility.

on what date [redacted] introduced [redacted] to the intelligence collectors. Khan observes that [redacted] states in his declaration that on November 9, 2002, [redacted] reported "information he got from his sub-source, [redacted]" [redacted] Decl. at ¶ 21. According to [redacted], at the time of the November 9 meeting, the intelligence collectors had not yet met [redacted] *See id.* ("However, at the time of this meeting . . ., we did not know the source of this information. If we did, it would have been noted in the written report. It took some time to build enough trust with [redacted] that he was comfortable introducing us to his sub source, [redacted] . . . ."); *see also* [redacted] Decl. at ¶ 24 ("At the meeting recounted in IIR 044 0025 03, [redacted] provided to me information that he had obtained from a sub-source in his neighborhood . . . . I cannot say for certain whether [redacted] got his information as reported in this IIR from [redacted] a source [redacted] would later bring to me . . . .").

Yet, Khan contends, it is clear from other intelligence reports that [redacted] had been providing information to the intelligence collectors since at least as early as October 29, 2002. *See* IIR 6 044 0249 03 at 1 (information provided by [redacted] acquired on October 29, 2002). Therefore, Khan concludes that the intelligence collectors must misremember the sequence of events. Because of their faulty recollections on this point, Khan suggests that the Court should not rely on the intelligence collectors' declarations to bolster the intelligence reports at all.

The government attempts to explain the disputed timeline. According to it, [redacted] had introduced [redacted] to intelligence collector [redacted] before [redacted] had introduced [redacted] team leader, [redacted] *See* May 13, 2010 Hr'g Tr. 183:20–l 25. And therefore the government concludes that it must have been

only [redacted] who met [redacted] after the November 9, 2002 meeting.

The record does not support the government's explanation. According to [redacted] "[b]ecause the information [redacted] provided was assessed to be reliable and important, my Team Leader also took an interest in [redacted] and attended several of my meetings with him.' [redacted] Decl. at ¶ 38. And 2–A0758, the team leader, states that he "reviewed [redacted] IIRs before disseminating them." [redacted] Decl. at ¶ 12. Therefore, [redacted] would have known about [redacted] on October 29, 2002, when IIR 6 044 0249 03 was produced.

The Court is persuaded, then, that the intelligence collectors' declarations inaccurately detail the timeline of when [redacted] introduced the collectors [redacted] It is not persuaded, however, that these inaccuracies require the Court to disregard the declarations. Indeed, the Court cannot conclude that all of the information provided by the intelligence collectors is incorrect merely because they misremember when [redacted] introduced [redacted] to them. Although the mistaken recollections do give the Court some pause, the inaccuracies do not relate to the collectors' assessments of their sources' reliability. That assessment, the Court notes, was supported by the collectors' independent verification of much of the reported information. Hence, the Court concludes that it can rely on the declarations to supply the information needed to assess the reliability of IIR 6 044 0249 03, IIR 6 044 0266 03, IIR 6 044 0025 03, and IIR 6 044 0300 03. And based on this information, it finds those reports reliable.

## B. *Reports Detailing Evidence Recovered at Khan's Properties*

▮ At the motions hearing, Khan challenged as inherently unreliable [re-

dacted] documents describing the items seized from Khan's properties [redacted] because heavy redactions did not permit the Court to assess where the information came from and who reported it. *See, e.g.,* May 14, 2010 Hr'g Tr. 49:12–50:4. The Court agreed with Khan. *See* May 14, 2010 Hr'g Tr. 50:8–21. Nevertheless, Khan's counsel stated that the Court could assuage his concerns regarding the reliability of [redacted] reports if the Court reviewed unredacted copies of the documents. *See* May 17, 2010 Hr'g Tr. 47:2–14. To that end, the government submitted unredacted copies [redacted] *ex parte* to the Court. From its own review, the Court concludes that [redacted] documents contain sufficient indicia of their reliability. Although the Court cannot discuss the unredacted contents of those documents, [redacted] summarizes the hallmarks of reliability that the Court finds persuasive. [redacted] The Court finds those recitals accurate and persuasive.

C. *December 17, 2002 Interrogation Report*

[redacted] Lastly, Khan contends that the interrogation summary reporting his admission [redacted] is inherently unreliable. He suggests ambiguities in the translation process contributed either to his failure to understand the question [redacted] or to an incorrect transcription of his answer. *See* May 13, 2010 Hr'g Tr. 36:19–37:4 ("So, Judge, I would just point out [redacted] how was that question asked? What was his understanding of what he was answering during this time when he was in Bagram? Did he think they said what about [redacted]—he could have understood this to mean [redacted] *see also id.* at 38:8–10 ("I just want to point out that a question) [redacted] being translated into Pashtu and answered, there's a lot of assumptions."); *see also Odah v. Obama,* Civ. A.

No. 06–1668 (D.D.C. May 6, 2010) (unpublished memorandum and order) (discussing the problems associated with interrogation summaries).

The Court concludes, however, that it need not rely on the four corners of the interrogation summary to determine its reliability—the other evidence in the record corroborates Khan's admission [redacted] *See Rugendorf,* 376 U.S. at 533, 84 S.Ct. 825; *Laws,* 808 F.2d at 100–03; *cf. Bensayah,* 610 F.3d at 726 ("We disagree with Bensayah's broad contention that two pieces of evidence, each unreliable when viewed alone, cannot ever corroborate each other."). Specifically, [redacted] reliably reported to U.S. Army intelligence collectors that an HIG in Kandahar was targeting U.S. and coalition forces [redacted] During a search of one of Khan's properties on November 13, 2002, U.S. personnel found [redacted] That Khan admitted approximately one month later to having [redacted] then, is entirely consistent with [redacted] information and the recovered physical evidence. The Court therefore concludes that it may consider Khan's December 17, 2002 interrogation summary when assessing the government's case for detention.

V. **Putting the Evidence Together**

The Court concludes that the key pieces of evidence deployed by the government are reliable. Based on that evidence, the Court finds that the government has met its burden to establish by a preponderance of the evidence that Khan was a "part of" HIG. *See Hamlily,* 616 F.Supp.2d at 75; *see also Bensayah,* 610 F.3d at 725. The government has shown that HIG is an associated force of al-Qaida and the Taliban. And it has demonstrated that Khan was a communicator for an HIG cell in

Kandahar, Afghanistan, in 2002. Indeed, the government recovered from Khan's property [redacted].[19] The government's narrative, then, corroborates itself—that [redacted] recovered from Khan's properties renders reliable [redacted] report [redacted] and vice versa.

In light of this evidence, the Court does not find credible Khan's insistence that he was merely managing a small petrol shop at the time of his capture. [Redacted].[20] Because the Court finds that it is more likely than not that Khan was "part of" HIG, Khan is lawfully detained. Therefore, the Court will deny Khan's petition for a writ of habeas corpus. A separate Order will be issued on this date.

### *ORDER*

JOHN D. BATES, District Judge.

Upon consideration of Khan's petition for a writ of habeas corpus, the other pending motions in this case, the parties' several memoranda, the evidence presented and reviewed at the evidentiary hearing, and the entire record herein, and for the reasons stated in the Memorandum Opinion issued on this date, it is hereby

**ORDERED** that Khan's motion to strike the supplement to the government's factual return is **DENIED;** it is further

**ORDERED** that the government's motion to file a second amended factual return is **GRANTED;** it is further

**ORDERED** that [220] Khan's motion for leave to file exhibits is **GRANTED;** and it is further

19. [Redacted]

20. Moreover, the Court cannot give dispositive weight to Professor Williams's observation that it is unlikely that HIG had a cell

**ORDERED** that Khan's petition for a writ of habeas corpus is **DENIED.**

**SO ORDERED.**

operating in Kandahar in 2002. Indeed, during cross–examination Professor Williams conceded that "[t]here is a possibility" that HIG was operating in Kandahar in 2002. May 13, 2010 Hr'g Tr. 121:10–11.